The next case today is Gabrielle Lozada-Manzano et al. v. United States, appeal number 21-1276. Attorney Rivera, please introduce yourself for the record and proceed with your argument. Good morning to the Honorable Court. Attorney Alan Rivera Fernandez, representing Appellant Gabrielle Lozada. Proceed. Good morning, Your Honor. May I reserve two minutes of rebuttal out of my ten-minute total? Yes, you may have it. Thank you, Your Honor. This case is fairly simple. Appellant brought forth a civil claim against the United States under the Federal Tort Claims Act for malicious prosecution and other actions. The appellant proceeded with some evidence that he had gathered against the United States on the basis of summary judgment. The government rebutted and opposed the motion for summary judgment before the district court. And Appellant now poses that the district court inappropriately granted summary judgment in favor of the United States, drawing all reasonable inferences provided by the evidence that Appellant brought forth against the case and dismissing in its entirety the action. The crux of our claims is basically that a federal task force officer fabricated evidence against Appellant, and he was in prison for more than ten months. According to Pro Reco case law, in a malicious prosecution case, the appellant survived three out of the four prongs. The only disputed prongs were without probable cause and malice that is necessary to bring forth an action. And that was the whole argument in summary judgment. The federal government, during the grand jury hearing, stated the arguments and facts backwards when it already knew that the defendant at that moment and the appellant today in the civil case had been arrested for another unrelated matter. Counsel, the district court found that you had not presented enough evidence for a reasonable jury to conclude that the FBI agent who testified to the grand jury acted with malice. The district court also concluded that you had not shown lack of probable cause because the grand jury indicted. You were given the opportunity to depose the FBI agent about what the basis of his testimony was. But you did not make any effort to depose the FBI agents involved in this investigation in the time period that you were allowed. Your argument proceeds on the assumption that certain documents existed and therefore it must be true that the FBI was aware of those documents. But there is not any evidence in the record that the FBI agent who gave a rather summary description of this to the grand jury in fact knew of any of that evidence. You have the burden of proof here and while one might not be happy with how the FBI proceeded before the grand jury, it is your burden to show malice and it is your burden to show lack of probable cause. So let's go to what the FBI agent actually said to the grand jury and please point out to me what the evidence is. First as to malice and second as to lack of probable cause. Evidence known to the FBI. Four minutes remaining. Yes, your honor. The agent that testified before the grand jury, his name is agent Fernando Oliva. He testified on behalf with the prosecutor on that case. As to malice, the narration of the facts was presented completely backwards. No, no, no, no. What do you mean backwards and what evidence do you have in that the agent knew that he was presenting it backwards? There is no evidence in this record that the agent was aware of the 911 call or as of the timing notation on that call. Your honor, he stated on the record before the grand jury that a 911 call was made and that there is only one 911 call that was made at 435 p.m. That was that was as to the position of the minors. Andrey Galoka, Andrey Melendez Galoka. He stated that there was only one phone call made and the timestamp from the 911 governing board of Puerto Rico certifies that that call was made at 435 p.m. So when the agent is stating clearly that that there was a 911 call, he must have knowledge from that that it was made at only one time. And and he argued. Judge Kayada, I think may have a question. Yes. I had a question about another thing that he said. He said repeatedly that the grandfather, the homeowner, had stated that there were three robbers rather than two. Was there any evidence in the record to support that statement by the. FBI agent. That there were three robbers or instead of two. So your honor, during the deposition of the grandfather, Mr. Alejandro Galoka, he clearly stated that there were two robbers. All the contemporary documentation from the Puerto Rico police and preliminary investigations close to the facts clearly stated that there were two robbers. And that is all across the appendix. Even at appendix 177, the initial report provided at summary judgment states in the investigators notes that there were two mask robbers instead of three. Conveniently for for agent Fernando Oliva before the grand jury, there were three robbers, two masks and my client that was completely unmasked. If I may interject, the precise testimony was that the grandfather. Who was assaulted and then his daughter's car was carjacked, quote, noticed a white van arrive and three individuals got out of the van. And that the grandfather said there were three individuals, two carrying handguns and one a pair of scissors. So what he said was he saw three individuals get out of the van, two with handguns and one with a scissor. That is not testimony that he was assaulted by three individuals. And later after this event, one of the grandchildren says, yes, there were three individuals involved. So, again, to be much more precise about this, what is the evidence that the agent at the time he testified that he noticed a white van and three? The grandfather said he noticed a white van and three got out of the van. The doubt was false. Well, your honor, the issue is that at page 20 of Alejandro Galocas Calvo's deposition and and during the deposition of J.D. Melendez at page 16 and my own contested material facts, paragraph 21, 22, they say otherwise. Is that a description of who got out of the van or who was involved in the assault? That was who got out of the out of the taxi van and that were involved in the in the assault, because it specifically says between three, three p.m. and three fifteen p.m. Two persons were dropped off in front of Alejandro Calvo's house by a white taxi van. And one of them pointed a gun at Mr. Galocas and told him to open the iron gate. All right, Mr. Mr. Rivera, if you can focus on Judge Lynch's question and the kind of format that she's put it in, which seems to me to be the right one, which is at the time of the grand jury presentation, because that's when we're looking to determine whether or not the government has probable cause. Can we say that either Agent Oliva or Assistant United States Attorney Soto knew other facts that they did not present that should fairly have been presented to the grand jury? And if so, how do we do that? Now, Judge Lynch has just pointed out the potential disparity between reports of the what happened by the agents and testimony that occurred in the depositions. But put that to one side for a moment. I just want to focus directly on what did they, to use the general phrase, what did they know and when did they know it? And whether the evidence in this case supports some sort of issue of genuine issue of material fact about what they knew and when they knew it. Now, you can also maybe answer if you think that I've focused this incorrectly. But I think Judge Lynch is right. We look at that question of probable cause at the time they testified before the grand jury and presented to the grand jury. So if you could focus me a bit on that, those issues. Yes, Your Honor. What Fernando Oliva, the FBI agent, not the prosecutor, what Fernando Oliva knew and clearly misrepresented to the grand jury and that never existed was the car exchange at the Borinquen Commercial Strip Mall. Can I interrupt you at this point? How do we know that he knew that at that time? That's the, I guess, the point that I'm trying to understand fully. It may be a case in which one hand doesn't know what the other hand is doing. That's a way of describing it. Or it may be that it's so obvious, or not so obvious, but there's a reasonable inference to be drawn that they did know. They had to have known under these circumstances. But I want to know how much of an inference you're requiring us to do and how much relying on some sort of direct evidence in the record. Well, Your Honor, that car exchange is the main point because there is no report either from the FBI or the Puerto Rico Police Department that backs that. Nor any of the witnesses saw that car exchange. The reason why that car exchange is so important because it's the only way that the FBI can link before the grand jury the commission of the assault and then the car crash where my client was involved. A grand juror actually questioned that issue. Who saw the car exchange? The prosecutor interjected and continued with other questions. So that is a very important fact because that does not exist and that is an actual misrepresentation. Excuse me, before you leave that point, it is true that the record does not establish that the initial carjacked car taken from the grandfather was taken to this shopping mall. And that the next carjacked car was also taken from that shopping mall. Nobody saw it. But I thought the record was clear that the car he was arrested in was taken from an area very close to that shopping mall. No, Your Honor. What does the record show that the FBI agent knew at the time he testified? At the time when the FBI agent testified, he knew that my client, Rosada, was arrested at a great Toyota Corolla that crashed in Isla Velde at 3.20 p.m. He also knew that the robbery ended due to the 9-1-1 call at 4.35 p.m. No, no, no, no, no. Yes, Your Honor. You keep referring to the 9-1-1 call. And I think you have to put that aside because you have presented no evidence, no evidence that the FBI agent had that information at the time he testified. So we're now looking at other things. And Judge Woodlock was focusing you on the question of the two cars that were carjacked. Only one car at Green Mitsubishi Montero was carjacked. Only one. Yes. Then the second car that your defendant was in that crashed. That belonged to the driver, Your Honor. It belonged to the driver. Okay. No carjacking was done there. And it was just a traffic stop that they were speeding at 3.20 p.m. That is stated by the arresting police officer at his note. And the car crashed at Isla Valle. The Toyota Corolla. Great Toyota Corolla. Okay. Yes, Your Honor. Thank you. That helps. Yes, yes. No, it was only one carjacking for a Green Mitsubishi Montero at the house that they assaulted. And the government's theory was that this car got taken someplace else. And then what was the government's theory as to what happened at that point? In the criminal case, Your Honor, the government's theory was that my client, the now appellant and then defendant, carjacked the house with two other people around 3, 3.20. He left the house with the Green Mitsubishi Montero and he abandoned the Mitsubishi Montero at the Borinquen Street Mall and then took off on the Great Toyota Corolla and was intercepted further down in Isla Valle. Okay, thank you. Thank you. Okay. I'm afraid I interrupted Judge Woodlock earlier, so I ask if he has further questions. Just this. You put your principal emphasis here on the carjacking, the subsequent carjacking information or the tradeoff of the cars. You have made mention of something that Agent Olivo must have known. But I want to know just a little bit more about why he must have known that. And I think it's a matter of inference rather than that you can say that he knew it, isn't it?  And that's why reasonable inference must be drawn at the summary stage, summary judgment stage in favor. This may be a question more focused for your friend later, but why did they dismiss the criminal case? Your Honor, so the criminal case was dismissed on behalf of the United States. They requested in the interest of justice. I'm sorry to interrupt you, but when you say on behalf of the United States, this was a prosecution in the Commonwealth. No, no, Your Honor. This was a federal prosecution with an indictment and everything. The United States moved for dismissal. Well, but it was initiated as a Commonwealth matter. The United States assimilated it or took jurisdiction over it. No, Your Honor. The Commonwealth denied even indicting. Who were the agents who arrested initially at the crash? All the agents at the crash were state police agents, Commonwealth agents. So it was a Commonwealth initiated investigation. Then the federal government took it over. Is that right? Some five to six months over. There is one of the reports states that the state prosecutor didn't want to file any charges against the defendant. For the issue of the car crash, at the moment of the Commonwealth arrest, there was only the issue of the car crash. And the state police found a gun on the Toyota Corolla. OK, Judge Keota, do you have some questions before the government has to defend itself? I'm sorry, you're muted. I have no questions. Thank you. Thank you. Thank you, Your Honor. Attorney Rivera, please mute your audio and video at this time. Attorney Bornstein has just texted me, Judge, and said he's been having a little trouble, lost his video, and his audio slowed down. I just want to check in with him, and I'd like IT, if it's OK with you, Judge, to pause the stream for us. Yes. Judge Lynch, and may it please the court, David Bornstein on behalf of the United States. The district court here correctly concluded that Mr. Lozada's case should not reach the jury because he cannot prove that we had prosecuted him without probable cause and with malice. As to probable cause, we had it because of the eyewitness identifications of him as one of the robbers and carjackers. And Mr. Lozada concedes, as a general matter, that eyewitness identifications do lead to probable cause. Let me ask you about that, because that bothered me when I read that in the record. Suppose a witness is asked if I can identify someone, and they pull out a Ouija board, and based on the Ouija board, they identify the person. Could the government then go before a grand jury and simply say to the grand jury, we had a witness identification. The witness identified the person. I would think that would be a complete fraud. Of course, it would be an unreliable identification. And here, this seems almost as bad as a Ouija board. You had, months later, someone who was masked is supposedly identified? Yes, Your Honor. There's no problem with identifying a masked individual. And you don't tell the jury that that's how the ID was done? Well, I think we did not have to tell the grand jury that they were masked. It would have been probably the better practice to do. But no, given the identification, there is no problem. And this court has repeatedly affirmed identifications of masked individuals. Can I pause with that case law, though? It's a kind of passing case law. Here we have children. We have evidence that the agents suggested, don't worry about tidying this up. We just want to get your general idea about it. There's a whole series of issues that go to, perhaps not the Ouija board, but do go to the kind of identification that might even have been excluded by a judge if it were ever presented to a judge. And we all sit here thinking about, would we grant the probable cause, give probable cause under circumstances if we'd known all of this information? That's an issue that comes to mind in evaluating this. You don't suggest that First Circuit case law says, once you've got somebody identifying somebody with a mask, that's enough, do you? Well, Your Honor, there have been cases. Sousa v. Howard, for example, is a case of this court's 488 F. 2nd 462, where the court said there is no constitutional problem of an identification of a criminal who had his lower face masked by a handkerchief. The ID was done by a 14-year-old one year after the fact. Excuse me, didn't this fellow have a cap and sunglasses and a mask? The record says simply he had a mask, but United States v. Oban, 961 F. 2nd 980, this court affirmed an identification of an individual who is wearing a nylon stocking mask, and the eyewitness said he was able to identify the person based upon the facial features, the shape of the face, through the mask. And this court upheld that. Suppose we assume that the prosecutor and the FBI agent who testified were competent. And he mentioned, I believe, the 911 call. Couldn't a jury assume that any competent prosecutor and FBI agent would certainly have checked out the 911 call given the chronological nature of the government's test case? A few things, and I'd like to just clear things up as I go. I want to say there is no indication in the record that the police officers who conducted the ID said, we're really not concerned about you getting this right. There's the only evidence in the record. There's two sources. One, there's the affidavit by police officer Rivera Rivera. You can find it on appendix page 328, where he says that the eyewitnesses were told to circle the photo showing anyone involved in the robbery. And then what the appellant sort of gloms on to is a statement by Andrick Melendez, who is one of the eyewitnesses who said, It was mentioned that we would simply be pointing out someone who looked like the robber. But Andrick does not say who said that. And indeed, I think the proper construction of that, since he did the identification alone, was that as he himself said otherwise in his deposition testimony, he was speaking about himself, that he believed that he could not identify the individual because he's wearing a mask. It was mentioned. I'm sorry, Mr. Porcy, but if we're doing close textual analysis of that, then we're supposed to read his testimony as a kind of soliloquy that he was having with himself about what he meant by what he said. A fair reading of that is that it was mentioned, unfortunately said in the passive voice, but it was mentioned presumably by someone else than him. We're parsing this fairly closely in part because there's a strain involved here. There seems to be some evidence in the case that it was suggested presumably by the agents who were involved that don't worry about it, this will be sorted out in the end. And so if we give it that construction, and I think it's a fair construction, don't we have to say that there is evidence in the case that goes the other way and this becomes a matter for a fact finder under challenging circumstances because as Judge Lynch pointed out, there was a failure to do further depositions because they were untimely. But on the record itself, with a fair reading of this language, not a strained one, isn't there a genuine issue of material fact? No, Your Honor, and I think the most generous reading that could be given was perhaps that was sent to Andrek Melendez when he did his identification, but the three children were identified on separate dates and there's actually nothing in the record as to whether the same officers did the identifications on all the dates. Does that make a difference? The real question is, what did Oliva and Soto know at the time that they presented it? Don't question that there are lacunae, I suppose here. On the other hand, as Judge Howard said in another case, you don't have to find a trout in the milk to decide that it's been watered. But Your Honor, these are simply speculations that are being... So I want to say there's really nothing in the record, especially when it comes to J.D. Melendez, who is the first eyewitness to identify Mr. Lozada as one of the carjackers. She said that she never had any doubt about her identification. She said that no one coerced her or manipulated her into making the identification. And when she was asked, did anyone tell you that you really didn't have to be certain about the ID? She said no. And so J.D. Melendez was the first one to make the ID. She says that at the time... Mr. Bornstein... Yes, Your Honor. She, in fact, is the one who identifies this plaintiff slash defendant as the man who pointed the gun at her head. Yes. Spent time with her. Yes. And she said, almost contemporaneously, I have no doubt that this is the man. And she says later, when she is asked at deposition, I have no doubt that this is the man. Her two siblings are much more equivocal, but what we have is a firm one-person eyewitness identification. Mind you, she is 11 years old, but she is the one who has had the gun put to her forehead and has spent the time with the guy who pointed the gun at her. Her two siblings did not undergo that experience. Is that an accurate rendition of the record? Your Honor, it is. And it's significant that J.D. had the most significant and long-lasting interaction with Lozada. You are right. She said he got very close to her. He spoke to her. And she looked up at him and was able to see his face and was able to describe it. Yes, Your Honor. Yeah, I don't think you've yet answered my question. I'd ask you, if we assume that the prosecutor and the agent were at least minimally competent, couldn't a jury infer that they took a minute or two to check the 9-1-1 record since they knew of the 9-1-1 call? Well, so, Your Honor, I think what was done was Officer Perez-DiFra looked into the matter. And, again, we don't actually – well, no, I'll take that back. We know that they got the 9-1-1 call, Officer Perez, on February 20, 2013. It then appears that he went and he interviewed the injured parties, presumably the eyewitnesses and the victims, about when the incident occurred. And this is his amended police report. And I want to say this is what Mr. Lozada claims was fabricated. But the amended police report – I'll ask it again. Well, I want to say they did look into it. And, okay, so then if they looked into it, then there you go. We now know that the government was aware of those – what are there, a dozen time stamps on the 9-1-1 call? That one? Mr. Bornstein. I'm sorry. I'm getting some bandwidth issues, so you're breaking up a little. But I am understanding what you're saying. How could they prosecute if they knew of the time of the 9-1-1 call? So, first of all, the time of the 9-1-1 call is simply – I think it's facially unreliable. Look at the date on the 9-1-1 call, the computer-generated date. According to that, the crime has not yet taken place because the crime took place – will take place on July 12, 2022, whereas it actually took place on July 22, 2012. Next, the 9-1-1 call provides a start and end time for the offense. Of the same second, the offense started and ended at 4.35 p.m. and two seconds. It also says that after the event occurred at 4.39, the caller said it just happened right now. And that 4.39 time is then automatically generated into the police complaint. But then it says that the caller – it's uncontested that the caller was the teenage grandson, Andrick Melendez. It says that the caller was female and that it was the female who owned the car that was stolen. But that was C.D. Melendez, Andrick's mother. So there are numerous factual problems with that 9-1-1 call. Can I ask a question about that? Do you say there wasn't – this 9-1-1 call didn't take place on the date that is in contest here? I mean there's no question that there are problems with that document, but is it the government's position? Of course, you know. You represent the government. You're here as a sovereign with a special responsibility to respond to this question, I think. Do you say that that 9-1-1 report is wrong as to date and as to time and as to individual involved? Yes, we are saying that no one – so at the time of the investigation indictment, no one said that the carjacking occurred at 4.30. No one. We're talking about before the presentation to the grand jury. There's a document that's generated here. That document talks about something, some event. I assume it's this event that it talks about in a kind of awkward way. But there's no dispute that it actually took place on that date or that this report came in at a certain time. I take it there's no dispute about that. And then the question is who was it? Was it a female or a male who called? Who was the person who did that? But I take it you don't dispute that there was such a document. Such a document was available to Soto and Oliva before they appeared before the grand jury, and it was nevertheless not disclosed to the jury. Yes, Your Honor, but neither was there an obligation to disclose it to the jury. That's United States v. Williams, the Supreme Court's 1992 decision. That's time. Mr. Bornstein, before you go on. Yes. I understood the position of the government to be that the timestamps on the 911 call do not, in fact, reflect the time that the call was received. Perhaps it happened on the day in question, but the fact that it is timestamped for a year later is a very good indication of the inaccuracy of the various bits of information contained. Judge Woodlock asked you to concede that the timestamp involved was the time that the call was received, but I had understood that the government was contesting that. So the fundamental issue here, and I really want to get us off of the idea of when the crime actually occurred as opposed to what we knew. Judge Lynch has asked, I think, the pertinent question here, and if you can answer it, and you should be able to, are you contesting with respect to the time that this was received? Yes. Yes, we are. What's the basis for doing it, the inconsistencies with the other aspects of this document? Sure. So when Officer Perez-Diffra, in around March 2013, interviewed the injured parties, he came back with the amended police report saying that they said that the crime took place between 2.45 and 3 p.m. And then later on March 8, 2013, when Officer Rivera-Rivera and Officer Perez-Diffra interviewed all of the eyewitnesses, they all said, except Alejandro Caloca, who is the old man, said that the robbers arrived at 2.45, and then his daughter and his three grandchildren all said that they arrived at 3 o'clock at his home. That's when the carjacking occurred. And indeed, later on, and here's the key thing, later on, years later, at the deposition, everyone, each of the children, said they agreed that when asked by the police when they arrived at their grandfather's home, they told the police it was at 3 p.m. The idea that it was at 4.30, the only basis in the record for it is the police report, which I think on its face has serious problems, and it's not just one year, Judge, it's 10 years minus 10 days is how off the date is. Moreover, and then there are the two documents based off of it, there's a police complaint on page 34 of the appellant's brief. He concedes that that document was immediately generated based upon the 911 call report, and there's the original police incident report, which if you look at the first page, it says it's based upon the information from the 911 system. That's all that there is at the investigation indictment phase for thinking that this occurred at 4.30 p.m. The only other basis in the record for thinking that it was 4.30 is you have to hop ahead by about seven years, maybe nine years, when the old man, Mr. Kaloka, is deposed. Now, he says at times that the carjacking occurred at 4.30. He also says at times that it didn't occur at 4.30. He also says at times he never said it occurred at 4.30. That's why we cite page 53's deposition where he finally says, all right, the robbers arrived at 2.45 p.m. I really don't know if they stayed for 20 minutes or two hours. Can I just pause on that? Yes, Your Honor. Because I want to understand the government's position with respect to that. The fact that a deposition took place much later or the fact that there were inconsistencies in the deposition are really credibility issues, aren't they? They don't disqualify the testimony. A fact finder has to look at those and say that really is not credible. Does a judge do that on summary judgment? I believe there comes a point where it's incredible as a matter of law, but really what matters, Your Honor, is that deposition testimony was not available to the agents and the prosecutor nine or so years earlier. That's not really the question. The question is whether or not there is evidence that we look at in the record right now. Not that the agents heard it seven years before, but whether or not their testimony or the inferences to be drawn of what transpired is affected by this after the fact recollection. That's really, I think, part of this. I want to know if you're saying as a matter of law you have to disregard what was said in that deposition by someone you keep referring to as the old man. I understand that there's a certain sensitivity by at least some people. As long as you say man, it's okay on this project. I apologize for that. So my point there, Your Honor, so first simply, I do want to distinguish and I will answer your question. I simply want to distinguish between what the evidence in the record might show us when the crime actually occurred versus what the eyewitnesses were saying at the time of investigation indictment. And at the time of investigation indictment, the only thing in the record they're saying is that occurred between 245 and 3 p.m. I challenge my brother to come with anything that was available to the investigators showing that the eyewitnesses themselves said that it was at 430. All that you have is a police report, which, as I think you can see, is facially unreliable. Now, getting to the issue about, well, okay, what if we actually did care about when the carjacking actually occurred? Could you credit the 430? I think no. I think no, first of all, because Mr. Alejandro Coloca's testimony on that was incredible as a matter of law. And it was incredible. I ask you to read the deposition because he goes within the same span of pages between saying it was at 430, it was not at 430. I never said it was at 430. It was at 430. It wasn't at 430. It's truly incredible to read how from one line to another his answer changes. And that's why I think, given that, you move that aside and then you listen to in the deposition testimony. Now, my brother keeps saying that all the eyewitnesses after deposition said the carjacking occurred at 430. That's simply not right. Andrick, his testimony is that it occurred at around noon or 2 p.m. J.D. says it was maybe 3 p.m. or 4 p.m. Mother Sadie says it's maybe 3 p.m. or 4 p.m. And it's only Alondra who says that it was maybe 4 p.m. or 5 p.m. But you get that huge span. But the key thing you're on are all of them. They say it's been a long time. So our memories are a little weak. But, you know, here is an interview report from the time where you said it was 3 p.m. They all said, yes, we told the police that the carjacking was at 3 p.m. And I think based upon that, it's simply impossible for a jury to find that we acted with malice and without probable cause based upon a police report that is unreliable on its face because it said the crime occurred 10 years in the future. And also because all of the witnesses were saying that the crime occurred between 2 45 and 3 p.m. And in order to prove malice, your honor, it's agreed upon by the parties under Puerto Rico law. You need to show that there is no rational basis for the prosecution. But there was a rational basis given the consistent testimony being given by the eyewitnesses. And once again, we believe we had probable cause. This idea that the police showed up and said, just point to someone. It really doesn't matter if you're certain or not. That's not true. The only evidence in the record about it, one comes from Andrick. And I agree. He says it was mentioned. He doesn't say who mentioned it. I suppose a jury interpreting the light most favorable to Mr. Lozada could think that maybe an agent told Andrick that. But Andrick did his I.D. on February 14th, 2013. On February 2nd, 2013. Yes, your honor. When you say you have probable cause, are you pointing to anything other than the witness I.D.s? No. We are pointing to the witness I.D.s. That was our basis. Second question is, what do you say about the plaintiff's argument that the agent testified repeatedly that the grandfather said there were three robbers? When we look at what he seems to have said, he seems to have said a taxi came up, two guys got out, the taxi went off. And there were two robbers. What's your response to that? I think that the FBI agent was mistaken. I'll say two things, actually. Because agent Oliva was never deposed by the plaintiff, by the appellant, despite years of being able to do so, we actually don't know what the basis of that was. And it's possible that agent Oliva spoke to an agent who spoke to Mr. Alejandro Caloca who may have said it was three people. He may have said that. We simply don't know because there is no deposition. However, if we look at his deposition nine years later, just Mr. Caloca's, he does say that he believes it was two people. And then Andrick, his grandson, says repeatedly, no, I think it was three people. So what the basis of Oliva's statement is, we simply don't know because the deposition wasn't taken by the plaintiff. It was his burden to do so. And that, again, is why he simply cannot prove that that testimony was knowingly false. Let me stay with that for a second. If he says the grandfather said there were two, and there's no evidence in the record that the grandfather ever said there were, when he said the grandfather said there were three, and there's no evidence in the record that the grandfather ever said that, how do you get around that by speculating that perhaps the grandfather might have said it, but we don't know? Because we're talking about what the grandfather, as the principal victim, said. And the three is necessary to align with the number of people found in the car. And yet, it seems that there's no evidence to support that three, as far as the grandfather stating it. I think the district court here correctly found that whether it was two or three robbers is irrelevant. It's simply irrelevant to the grand jury's finding of probable cause to indict Mr. Lozada, which, again, is really based upon the eyewitness identifications. How many people did they find in the car, in the car chase? Wasn't it three? There were three. So isn't it handy that the three aligns with the three? Well, it may have been, you know, I think if you read through the grand jury testimony, I think the preferable thing for Adrian to leave it to have done is, you know, we allow hearsays to describe the basis of his hearsay knowledge. Since he didn't do that, I unfortunately do not know what the basis of his saying three is. But the record does demonstrate that at least one of the eyewitnesses claimed that there were three robbers. I'd also like to point out, my brother, getting back to the grand jury testimony, said that... Before you launch into that, Mr. Pornstein, I just want to follow this up just in terms of procedural. Of course. You're not saying, are you, that the record is unreliable that we have in front of us because there was no deposition taken by the plaintiff here, or that there was no further explanation by the agent. We just deal with the record that we have. That's a little bit of, maybe it's aroma to cast around the record, but it really is not part of our consideration. We deal with the record that we have, that it would have been better if the plaintiff had been more vigorous in his discovery here or more timely in his discovery. On the other hand, it would have been better if your agent had been more candid about all that he knew and all that he didn't know and the basis for that. But we don't have either of those. We're just left with this kind of open textured, I guess I would say, record in this case. And the question is whether or not that texture is open enough to permit the case to pass through to go to a fact finder who has to make those determinations. Yes, Your Honor, that's precisely it. Based upon the record, can Mr. Lozada show that he was prosecuted without probable cause and with malice? And I think this discussion about what is the basis of the agent saying that there were three robbers instead of two, I simply don't think that defeats probable cause. It appears to have been a mistake, but not a mistake that defeats probable cause. Mr. Lozada thinks that the number is significant in part because he says that the agent testified that there were two mass robbers and one unmasked robber. That's simply not right. Read the testimony yourself. There is no statement of that sort. And at the end of the day, I really do believe it comes down to the eyewitness identifications. The fact that the first eyewitness to identify Mr. Lozada, J.D. Melendez, said that she never expressed any doubts about her I.D. She denies that anyone told her that she didn't have to be accurate in her I.D. She said that she could make the I.D. at the time since her memory was good. And indeed, the only person to testify about what was said to the eyewitnesses in general, there's Andrick testifying to what was said to him on February 14th. But what was said to J.D., for example, on February 2nd when her I.D. took place is Officer Rivera Rivera on page 328. He says the eyewitnesses were told to circle the photo showing anyone involved in the robbery. And I think in order to import from other parts of the record that other things were said, that is truly speculation. And a jury would then have to speculate that what was said to Andrick was said to J.D., that J.D. lied when she said it wasn't said to her. And then to follow that sort of chain of speculation on speculation, which which simply is impermissible. Here, the district court correctly found that Mr. Lozada couldn't get to a jury simply because there was a rational basis for his prosecution, which was the eyewitness identification of at least J.D. corroborated by her two siblings. I also think it is significant that her two siblings, although at the time of their deposition, said that they had that they voiced uncertainties about it. I asked you to look at the actual words they used. Alondra said she voiced uncertainties about it by saying that the defendant looked like the carjacker. And and courts have held that saying that someone looks like an individual is actually sufficient for a positive identification. Just one case, United States v. Skeens, 494 F. Second, 1050. It's a D.C. circuit case from 1974 in which the majority of the panel says that there was a positive identification when the witness said that looks like the man. And that was an issue in the case about whether or not that was a sufficient positive identification. And there are plenty other instances, Your Honor, which I can provide in which an individual says that looks like something and that is held to be a positive ID. And because there was no basis to find that the United States lacked probable cause or acted with malice because of a 9-1-1 call report that is facially unreliable. And you're now repeating yourself. I'm sorry, Your Honor. I do not mean to repeat myself. If there are no further questions, then we would ask you to affirm the district court. All right. Thank you. Your opponent has reserved two minutes. Thank you, Your Honor. At this time, Attorney Bornstein should please mute his device. And, Attorney Rivera, please reintroduce yourself on the record to begin. Good morning to the Honorable Court. Attorney Alan Rivera on behalf of Appellant for my rebuttal part. Yes, Your Honor. I've been listening to my brother's statement. First of all, the 9-1-1 call is reliable as to the certification made by the 9-1-1 Board of Government. And that information was provided in criminal discovery by the United States government. Rules for thee, but not for me, right? At Appendix 182, the Board of Governors of the 9-1-1 states that the certification is dated July 22, 2012 at 4.35 p.m. That is the certification from the board stating that it was taken out of the system. Not only that, Your Honor. At Appendix 273, it is Andrew Melendez's transcript of the 9-1-1 call stating that it happened right now. I have the record, the voice record of that call. It is very disturbing. It is an excited utterance. I would play it, but sadly in Spanish, so I provide a certified translation of that copy. But the victims are yelling at 4.35 p.m. in an excited manner that it was happening right now. And that was received by the 9-1-1 call system. As to the statement of Judge Cayara, this is a Ouija board identification. First of all, Alondra and Hendrick voiced disturbing concerns to the agents, especially to the prosecutors. If you read my uncontested statement of facts at paragraph 76, Alondra stated that she had concerns. Hendrick further stated that all the robbers were masked. And the government relies on J.D. Melendez's identification as the sole basis for prosecution because they had surrendered both Alondra and Hendrick due to their stated concerns during the deposition. However, J.D. at that moment was 11 years old. And if you read paragraph 82 of my unconstituted statement of facts, she was the only minor that was interviewed alone by federal agents during the process of photo identification. This is at page 27 of her deposition. And that was not only mentioned to the grand jury but was not disclosed to the defendant's attorney. That's time. Thank you, counsel. We'll take the case under advisement. Thank you, Your Honor. That concludes argument in this case. Attorney Rivera and Attorney Bornstein, you should disconnect from the hearing at this time.